OLIVIA FINLAY & others *vs.* EASTERN RACING ASSOCIATION, INC.

Suffolk.    November 4, 1940. — January 3, 1941.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, & DOLAN, JJ.

*Racing. Wager. Evidence*, Judicial notice. *Equity Pleading and Practice*, Appeal, Bill.

In the circumstances, the Superior Court rightly proceeded to a decision on the merits of a suit by one alleging himself to be a "winning patron" against a corporation, licensed under c. 128A inserted in G. L. (Ter. Ed.) by St. 1934, c. 374, § 3, to conduct horse racing meetings and to conduct and supervise pari-mutuel wagering, for an accounting and determination of the amount of a fund with which the defendant was chargeable and of the proper award which, it was averred, should have been made to the plaintiff; whether the relation of the defendant to the plaintiff was that of trustee or of debtor was not determined.

A corporation, conducting a horse racing meeting and pari-mutuel wagering thereat under a license issued in accordance with c. 128A, added to G. L. (Ter. Ed.) by St. 1934, c. 374, § 3, was justified in making payments to "winning patrons" from the "pool" immediately upon determination by the "placing judges," confirmed by the "Stewards," that a certain horse was the winner of a race; and one, who would have been a winning patron on the basis of a decision by "Stewards" the next day determining another horse to have been the winner after a hearing upon a protest which had not been filed until after such payments had been made, was not entitled to a payment by the corporation on the basis that he was a winning patron.

In a suit in equity involving a horse racing meeting and wagering thereat under c. 128A, inserted in G. L. (Ter. Ed.) by St. 1934, c. 374, § 3, this court did not take judicial notice of nor consider the rules of the State racing commission which did not appear to have been introduced in evidence in the trial court and were not a part of the record in this court, although both parties in their briefs before this court laid stress upon them and a copy of them was handed to this court at the argument.

The plaintiff, in a bill in equity for an accounting by a corporation conducting a horse racing meeting and pari-mutuel wagering thereat and a determination that the plaintiff was entitled to be paid as a "winning patron," was not entitled to contend that he could recover because he relied on "the printed conditions contained in the official program," which were in evidence, where no claim of liability based on falsity in the statement of the "conditions" was set out in the bill.

BILL IN EQUITY, filed in the Superior Court on November 4, 1935.

After hearing by *M. Morton*, J., a final decree was entered dismissing the bill. The plaintiffs appealed.

*H. Wise*, (*F. J. Linehan, Jr.*, with him,) for the plaintiffs.

*H. W. Corbett*, for the defendant.

QUA, J. The original plaintiff, in her bill in equity brought in behalf of herself and others similarly situated, alleges in substance that she purchased and holds a "daily double" ticket, entitling her to a winning award or dividend in the pool deposited with the defendant by patrons wagering upon the "daily double" at the horse races conducted by the defendant at its track known as "Suffolk Downs" on July 18, 1935; that the defendant refuses to pay such award or dividend to the plaintiff and to other holders of winning tickets; that the defendant is a stakeholder, custodian, and depository and is in a fiduciary relationship toward the plaintiff and other purchasers of tickets; and that by its refusal to pay it has violated its fiduciary obligations. The prayers are for an accounting, for the determination of the amount of the fund or pool with which the defendant is chargeable and of the awards or dividends to which the plaintiff and others similarly situated are entitled, that payment thereof be ordered, and for other incidental relief.

Several persons have filed intervening petitions as parties plaintiff. No question has been raised as to the propriety of an equity suit in a case of this kind or as to the propriety of allowing ticket holders other than the original plaintiff to intervene. The original plaintiff and the interveners are hereinafter referred to as the plaintiffs.

The case was heard upon agreed facts supplemented by evidence. Among the facts agreed were these: The defendant was licensed under the provisions of G. L. (Ter. Ed.) c. 128A, inserted by St. 1934, c. 374, § 3, to conduct horse racing meetings and to conduct and supervise "the pari-mutuel or certificate system of wagering on the speed or ability of horses." c. 128A, § 5. At the races on July 18, 1935, the plaintiffs and various other patrons

wagered that in the "daily double" the horse "Argoan" would win the first race and the horse "Ste. Louise" the third race. In fact "Ste. Louise" did win the third race, and no issue is raised concerning that race. But in the first race a horse named "Masked Gal" crossed the finish line first and was "officially" declared the winner. "Argoan" crossed the finish line second and was "officially" declared second. The decision as to the winner was made by the "placing judges". and "confirmed by the Stewards," whereupon "the number of the winner was flashed in electric lights on a board in view of the public and a red light also flashed on said board under the word 'result.'" Upon the result of the third race being declared "official," the defendant immediately began payment of the entire "daily double" pool, less the deductions permitted · by law, to patrons wagering that "Masked Gal" and "Ste. Louise" would win their respective races. On the evening of the same day "a protest was made" (but not, so far as appears, by any of the plaintiffs or by any ticket holder) that "'Masked Gal' had not been eligible to enter said first race by reason of the fact that said horse had won three races, and that, therefore, its entry did not comply with the conditions of the race in so far as said conditions provided that said race was for nonwinners of more than two races." On July 19 "the Stewards . . . found that the allegations of the protest were correct, and took away the purse money which had been awarded 'Masked Gal' as the winner, and awarded said purse money to 'Argoan,'" which had finished second." The purse money is not part of the pool formed by the wagers of patrons, but is provided by the licensee (the defendant) and only the owners of competing horses participate in its distribution. There "is no way to determine how much persons wagering that 'Argoan' would win the first race would be entitled to if 'Masked Gal' had not been in the race." One hundred thirty "daily double" tickets were sold "on the combination of 'Masked Gal' and 'Ste. Louise,'" and two hundred four "on the combination of 'Argoan' and 'Ste. Louise.'" If the "daily double" pool had been distributed to patrons

who bet on the combination of "Argoan" and "Ste. Louise" instead of to those who bet on the combination of "Masked Gal" and "Ste. Louise," each holder of a $2 winning ticket would have received $87.20.

A copy of the "Official Program" introduced as an exhibit contains, under the heading "First Half of Daily Double First Race" and over the list of horses entered, several lines, mostly in small type, apparently descriptive of the terms upon which the race was to be run. These lines begin "FOR TWO-YEAR-OLDS. Non-winners of More Than Two Races."

The question to be decided is whether it was the defendant's duty to distribute the "daily double" pool to the purchasers of wagering tickets on the basis that "Masked Gal" won the first race, as had been "officially" declared by the "placing judges," "confirmed by the Stewards," and "flashed on . . . [the] board" after the race and before the defendant began to distribute the pool, or on the basis that "Argoan," which actually came in second, won the first race because on the next day, after distribution of the pool, the "Stewards" upheld a protest against the eligibility of "Masked Gal" on the ground that the race was for horses which had not previously won more than two races and that "Masked Gal" had won more than two races, and so awarded the purse money to "Argoan."

It may be well to preface our discussion with a few words as to what we conceive the function of the court to be in a case of this kind. It is common knowledge that at formal horse races there are persons in attendance who are charged with the duty of determining which horses are the winners under the terms and conditions under which a race is being conducted, much as at football or baseball games or other public contests persons are provided to act as referees or umpires. Purchasers of race tickets must be held to know this and to consent to be bound by the judgment of those regularly charged with the duty of decision. At least in cases where as here there is no charge of bad faith, it cannot ordinarily be the duty of a court either to determine the eligibility of entries or to decide which horse won a race. There is nothing in the statute itself to suggest that the

Legislature intended to impose upon courts any duty of decision in these matters. On the other hand, since the statute has expressly made wagering legal at racing meetings held in accordance with its provisions, we find it difficult to discover any good reason why the law should refuse a remedy for the recovery of the "award or dividend" due under § 5 to those who have been determined by the duly constituted authorities of the race to be the "winning patrons." No argument has been made against the existence of a remedy. In *Feeney* v. *Eastern Racing Association, Inc.* 303 Mass. 602, a winning patron was allowed to recover in an action of contract against the "association." In the present case the plaintiffs have brought a bill in equity on the theory that the defendant became a "custodian" or "depository" under § 5, and no objection has been made to the form of procedure on the ground that it is in equity instead of at law. *Clark* v. *Flint,* 22 Pick. 231, 237. *Dearth* v. *Hide & Leather National Bank,* 100 Mass. 540, 543. *Reynolds* v. *Grow,* 265 Mass. 578, 580, 581. *Jones* v. *Jones,* 297 Mass. 198, 202. Under the circumstances we think that the Superior Court rightly proceeded to a decision of the case upon the merits whether the relation of the defendant to winning patrons was that of a trustee or of a debtor. What the relation was we need not determine in this case. But the issue to be decided by the court is not whether "Argoan" or "Masked Gal" really won the first race. The issue to be decided is whether the plaintiffs have proved that the duly constituted officials at the race whose duty it was to judge the race have made a decision as a result of which the plaintiffs became "winning patrons," entitled to share in the distribution of the fund contributed by those who bought tickets for the "daily double," and this in turn depends upon whether the plaintiffs' standing is to be deemed fixed by the decision made by the "placing judges" and "confirmed by the Stewards" immediately after the race, upon which decision the "pay-off" to ticket holders was actually made, or by the decision of the "Stewards" the next day sustaining the protest upon "Masked Gal" and awarding the purse to "Argoan."

We construe the agreed facts hereinbefore stated as indicating that the original decision that "Masked Gal" was the winner was made by the officials whose duty it was to make such decisions, and we assume in favor of the plaintiffs that the "Stewards" had power the next day, upon sustaining the protest, to award the purse to "Argoan," although it may be pointed out here that a decision as to the rights of horse owners in the purse is not in and of itself a decision as to the rights of ticket holders in the pool.

There are reasons which lead us to the conclusion that the defendant was justified in distributing the pool immediately in accordance with the original announcement of the winner notwithstanding the later protest and the decision the following day.  It is common knowledge that these racing meetings are attended by great numbers of persons, many of whom come from long distances; that they place their wagers by buying tickets for cash, very often in small amounts; that they are attracted by the interest aroused by seeing the races and learning whether they have won or lost; that often large numbers of patrons wager upon the same race (in this instance three hundred thirty-four $2 tickets on only two of the many possible combinations); and that the "association" has no means of communicating with them after the races are over for the day and they have left the grounds.  We think that patrons reasonably expect to know the results immediately after the race and to receive their money, if they have won, before leaving the premises and without the necessity of returning at some later time to collect a sum which may be too small to justify the effort.  It would seem that a great part of the interest and excitement which racing meetings are designed to stimulate and upon which they exist would be lost if the final decision and the "pay-off" could be delayed by somebody's protest, the investigation of which might take days or possibly weeks.  The practical reasons for immediate action that apply to the "pay-off" to ticket holders do not apply to the award of the purse to horse owners.

There are some indications in the statute itself that the Legislature intended an immediate adjustment of the "pay-

off" to ticket holders. Section 5 of c. 128A provides for payment by the licensee to the racing commission of one half of the "breaks," calculated upon the winnings, upon the day following each day of a racing meeting. The same section also now provides that race tracks "shall be equipped with automatic betting machines capable of accurate and speedy determination of award or dividend to winning patrons, and all such awards or dividends shall be calculated by a totalisator machine or like machine, except at state or county fairs." Although this last provision was inserted by St. 1935, c. 454, § 1, enacted a few days after July 18, 1935, we think, nevertheless, that it has some tendency to show that speedy ascertainment of the winnings was intended from the beginning. Of weight also is the fact that it is impossible to put patrons who wagered upon "Argoan" to win the first race in the same position in which they would have been if "Masked Gal" had not run, because it has been agreed that there is no way to determine how much they would have been entitled to· in that event. The race cannot be made · over by calculation into the equivalent of a race in which "Masked Gal" did not take part.

We do not intimate that the authorized judges could not correct an error discovered before the "pay-off," nor do we undertake to determine either the time or the manner in which they should perform their duties. We hold that the plaintiffs in this case as ticket holders have not shown that they are not bound· by the original decision upon the basis of which the "pay-off" was made, and that they have not shown that they acquired any legal rights through the subsequent protest and the change in the award of the purse.

In their briefs both sides have laid stress upon rules of the State racing commission. G. L. (Ter. Ed.) c. 128A, § 9, as amended. A purported copy of these rules was handed to us at the argument in this court. We cannot discover that the rules were introduced in evidence at the hearing in the Superior Court, or that they became in any manner a part of the record. In the facts agreed it was stated that the defendant was· "subject to the supervision, rules and regulations" of the commission, but the rules

themselves were not set forth or incorporated. During the hearing in the Superior Court a suggestion was made that the judge might "like to see the rule book." Counsel for the defendant thereupon stated that he had "no objection to his Honor seeing the rule book," but that he "did not want any unnecessary amount of rules that had no bearing on the case." Whether or not the judge saw the "rule book" does not appear. At any rate the record does not show that it was received in evidence. We cannot take judicial notice of the rules of the racing commission. We are not inclined towards a narrow and illiberal application of the doctrine of judicial notice, but a mere inspection of the book shown to us at the argument, purporting to contain three hundred twenty-nine rules of a highly technical character, doubtless changed from time to time, demonstrates the unfairness and impracticability of a system that would permit parties to reserve such a mass of material pertaining to a peculiar and highly specialized field to be presented for the first time to an appellate court, or of expecting any court on its own initiative and responsibility to discover and analyze it. Such rules of this kind as may be pertinent to a case should be formally placed before the trial court at the trial by some one of the recognized methods by which facts may be agreed upon or evidence introduced. They may then in due course become part of the record on appeal. No hardship will result. Certified copies, if insisted upon, can readily be obtained from the secretary of the commission. G. L. (Ter. Ed.) c. 233, § 76; c. 6, § 48, as added by St. 1934, c. 374, § 2. This is in accord with our previous decisions in analogous instances. *Commonwealth* v. *Crane*, 158 Mass. 218, 219. *O'Brien* v. *Woburn*, 184 Mass. 598. *Brodsky* v. *Fine*, 263 Mass. 51, 54. *Cook* v. *Cole*, 273 Mass. 557, 564. *Wolbarsht* v. *Donnelly*, 291 Mass. 229, 233. *Commonwealth* v. *Kimball*, 299 Mass. 353, 355. See *Roden* v. *Connecticut Co.* 113 Conn. 408, 413–416; *Robinson* v. *Baltimore & Ohio Railroad*, 222 U. S. 506; *Nagle* v. *United States*, 145 Fed. 302, 306; Wigmore on Evidence (3d ed.) § 2572. It is of course settled that we do not consider fact or evidence of which we cannot

take judicial notice and which has not been properly incorporated in the record. *Skinner* v. *Gray*, 130 Mass. 5. *Hale* v. *Blanchard*, 242 Mass. 262, 264–265. *Barnes* v. *Springfield*, 268 Mass. 497, 504. *Abeloff* v. *Peacard*, 272 Mass. 56, 59. *Carilli* v. *Hersey*, 299 Mass. 139, 145. The provisions of the rules have not been considered and do not enter into our decision.

The plaintiffs further contend that they are entitled to recover because they relied upon "the printed conditions contained in the official program." We suppose that the plaintiffs use the word "conditions" as meaning the statement to which reference has already been made, "FOR TWO-YEAR-OLDS. Non-winners of More Than Two Races." Not only did the judge find as a fact that the plaintiffs did not so rely, but even if they did rely upon the program, any claim of liability based upon an error or false statement is beyond the scope of the bill and of the intervening petitions. None of these mentions the program or sets forth any cause of action for errors in it or for real or constructive fraud or deceit in any form. *Pickard* v. *Clancy*, 225 Mass. 89, 95. *National Rockland Bank of Boston* v. *Johnston*, 299 Mass. 156, 157.

There can be no appeal from an order for a decree or from a specific finding of fact as such. *Graustein* v. *Dolan*, 282 Mass. 579, 583.

> *Appeals from orders and findings dismissed.*
> *Final decree affirmed with a single bill of costs to the defendant.*