JOSEPH ALIANO, Respondent, *v.* WESTCHESTER RACING ASSOCIATION, Appellant.

Second Department, December 22, 1942.

*Martin A. Schenck* (*Joseph S. Auerbach, Harold C. McCollom* and *George H. Boynton* with him on the brief), for appellant.

*Charles B. Kornreich* for respondent.

*John F. X. McGohey* (*John J. Bennett, Jr., Attorney-General,* and *Oscar S. Mann* with him on the brief), as *amicus curiæ.*

CLOSE, J. The plaintiff sued to recover the winnings on four two dollar " win " pari-mutuel tickets purchased at defendant's Belmont Park race track on " Cold Harbour," a horse entered in the last race on June 7, 1940. The horse selected by plaintiff won the race. The plaintiff, however, did not present the tickets for payment on the day of the race, and that evening he inadvertently destroyed them. On the following day he attended the race track, where he was instructed to address a letter to the defendant for the purpose of claiming the proceeds of the destroyed tickets. He wrote such a letter to defendant on July 31, 1940. It was admitted by defendant that the sum of $77.20, the proceeds of four two dollar " win " tickets on the horse chosen by plaintiff in the race mentioned, had remained unredeemed and that said sum was paid into the general fund of the State Treasury after April 1, 1941. The plaintiff recovered judgment which the Appellate Term has affirmed.

The facts in this case have been determined in favor of the plaintiff and such determination is not contrary to the weight of evidence. There is thus presented a question of law whether the winnings upon a pari-mutuel bet made at a race track conducted pursuant to the Pari-Mutuel Revenue Law (L. 1940, ch. 254), may be recovered without presentation of the winning ticket for payment. Section 12 of that law provides as follows: " *Disposition of unpaid money due on account of pari-mutuel tickets not presented.* The sum held by any corporation or association authorized to conduct pari-mutuel betting for payment of outstanding pari-mutuel tickets shall be retained by such corporation or association for payment of such tickets until April first of the succeeding year. Within ten days thereafter, the balance of such sum remaining unclaimed shall be paid over to the general fund of the state treasury. If subsequent to the first of April a pari-mutuel ticket is presented for payment to the corporation or association by which the same was sold, such corporation or association shall pay the same and may charge the amount thereof against unpaid money similarly accumulated on account of pari-mutuel tickets not presented for payment." The plaintiff seeks to sustain the judgment on the authority of *Giordano* v. *Metropolitan Jockey Club* (176 Misc. Rep. 506), upon which the courts below have relied. It was there held that the presentation of winning pari-mutuel tickets which had been

lost or destroyed was not a condition of payment for the reasons, (1) that section 12, which provides for the disposition of unpaid money due on account of pari-mutuel tickets not presented, impliedly provides for payment without presentation of the tickets where the claim was made before April first; (2) that the statute does not expressly prohibit payment unless presentation of the tickets be made; and (3) that section 9 of the law provides for the distribution of pari-mutuel pools to the "winners thereof."

The distinction drawn by the court in the *Giordano* case *(supra)* between claims made before and after April first is not justified by the language employed in section 12. It was there stated that if section 12 meant "that after April first tickets must be presented before payment can be made, it would be reasonable to infer that the failure to impose any such requirement with respect to payments made before April first was advertent and reflected an intent to sanction such payments even though the tickets were not presented." (pp. 507, 508.) The conclusion that section 12 fails to impose the same requirement for payment of tickets before April first as it does concerning tickets presented after April first appears to be unwarranted. It would seem that the word "unclaimed" used in the first part of the section, was taken out of the context and considered as standing alone and not in relation to the rest of the section. Not only is the section entitled: "Disposition of unpaid money due on account of pari-mutuel tickets *not presented*" but the first sentence provides for the retention until April first of "The sum held * * * for payment of *outstanding pari-mutuel tickets* * * *."" That the same requirement for payment of outstanding tickets is applicable to claims made either before or after April first is apparent from the use of the word "similarly" in the last sentence of the section. It is there provided that the racing association shall pay pari-mutuel tickets presented for payment after April first and "charge the amount thereof against unpaid money *similarly accumulated* on account of pari-mutuel tickets not presented for payment." Payment of such tickets presented after April first is thus directed to be paid out of money currently accumulated, or accumulated before April first of the succeeding year, and such money is similarly accumulated on account of pari-mutuel tickets *not presented for payment.* It is not accumulated on account of its being unclaimed by any claim other than the presentation of tickets.

It is contended that the Pari-Mutuel Revenue Law does not expressly prohibit payment to those who lose or destroy their

tickets. It is not necessary that the prohibition be express. A proscribed act may be just as effectively prohibited by an act prescribed, provided the prescribed act is mandatory and both acts are mutually exclusive. Such is the situation here. Section 12 provides for the accumulation of money due on account of tickets not presented for payment until April first when it is directed that such money be paid over to the general fund of the State Treasury. The disposition of such money by delivery to the State Treasury precludes its payment by the racing association to anyone else and no part of that money can therefore be paid to one claiming to be entitled thereto without the presentation of a ticket.

It is stated in section 9 of the law providing for the disposition of pari-mutuel pools, that " Every corporation or association * * * shall distribute all sums deposited in any pari-mutuel pool to the winners thereof, less ten per centum of the total deposits plus the breaks." We are of the opinion that the direction to distribute the deposits in the pari-mutuel pools to the winners thereof does not dispense with the necessity of presenting winning tickets as a condition of payment. The section in which such direction occurs and the entire statute must be read as a whole and interpreted in accordance with the intent and purpose of the Legislature in enacting the law. When so viewed, the statute cannot be held to sanction payment of the sums deposited in the pari-mutuel pools to the winners thereof who do not present winning tickets for payment. This conclusion is based upon a two-fold premise: *first,* the necessity of presenting tickets as a requisite of payment is indispensable to the pari-mutuel system of betting and is implicit in the whole Pari-Mutuel Revenue Law; and *second,* the law defines the duties of the racing association to the State in the conduct of pari-mutuel betting and imposes on the association a liability for the disposition of unpaid money directed to be accumulated on account of tickets not presented for payment which is inconsistent with the alleged liability of the association to pay claimants who do not present tickets for payment.

Pari-mutuel betting differs from the personal transaction between a bookmaker and a bettor, in which the agreement to pay winnings is made on the personal responsibility of the bookmaker. Under the pari-mutuel system every bettor contributing to the mutuel pool becomes in effect a bookmaker for every other bettor and the pool so constituted is responsible for payment of winnings. The racing association is the administrative agent for the collection and distribution of the pool and presentation

to it of a ticket for payment from the sum deposited in the pool is essential to the proper conduct of that system of betting. The failure of the Legislature to provide for lost or destroyed pari-mutuel tickets was undoubtedly due to a recognition that the nature of the pari-mutuel system of betting necessarily requires a ticket to evidence the bettor's participation in the pool and that payment could not practicably be made without presentation of such ticket.

Prior to the enactment of the Pari-Mutuel Revenue Law betting at horse races was illegal and the only remedy a bettor at a race track had was the recovery of his bet in a civil action. The law was not enacted for the purpose of legalizing betting at race tracks but of raising revenue for the State, " * * * it being the purpose of this act to derive from such betting as herein authorized a reasonable revenue for the support of government * * *." (§ 2.) Pari-mutuel betting on horse races was made lawful only " * * * if conducted in the manner and subject to the conditions and supervision provided by this act * * *." (§ 2.) The conduct of a bet includes not only the placing of the bet but also the payment of the winnings. (*Matter of Stewart v. Department of State,* 174 Misc. 902.) Pari-mutuel betting is lawful therefore only if the payment of the proceeds of the bet is in conformity with the statutory requirements respecting payment. There is implicit in all the provisions of the statute concerning payment to patrons the condition that tickets, which are essential to the pari-mutuel system, be presented. Thus section 5, which requires a bond of the association conducting pari-mutuel betting, directs that it be conditioned upon the association paying to the State all taxes imposed by the act and "that it will distribute to the patrons of pari-mutuel pools conducted by it all sums due *upon presentation of winning tickets* held by them, * * *." Section 6, providing for the place and manner of conducting pari-mutuel betting, states that " such place or places shall be provided with necessary equipment for issuing or vending pari-mutuel *tickets,* * * *." As above stated, section 12 provides for the " Disposition of unpaid money due on account of pari-mutuel *tickets not presented.*" The direction in section 9 for the distribution of all sums deposited in the pari-mutuel pools " to the winners thereof " does not define the manner in which payment is to be made nor state the conditions of payment. It is contained in the very section where the tax is fixed and the purpose of the provision for the omnibus distribution of all sums deposited in the pari-mutuel pools to the group of persons entitled thereto, less ten per cent and the breaks, was

primarily to specify that portion of the pool in which the State would share. The provisions which follow the quoted portion of section 9 pertain to the distribution of the ten per cent and the breakage retained by the association.

Section 9 allows the racing association only one-half of the ten per cent of the pools retained. One-half of the amount retained plus fifty per cent of the breakage goes to the State as tax. Benefit to the racing association is merely incidental to collection of a tax by the State which, pursuant to its declared purpose in enacting the statute, benefits most. Although the actions of the associations conducting pari-mutuel betting are sharply confined and strictly supervised by the State, the statute ought not to be interpreted so as to impose upon the associations an unfair burden and a liability against which even the bond required by law does not protect them. The bond is not conditioned upon the payment by the association of all sums claimed, including claims by persons who have lost or destroyed their tickets, but only upon the distribution to the patrons of all sums " due upon presentation of winning tickets " (§ 5). Also, the association is obliged to turn over to the general fund of the State Treasury all sums held by it " for payment of outstanding pari-mutuel tickets " (§ 12). The association cannot fulfill such obligation and at the same time pay the claims of persons not presenting tickets without subjecting itself to double liability. Since the provisions of the statute are for the benefit of the State, every fair intendment should be accorded the racing association in its interpretation where it is sought to charge the association with inconsistent liabilities.

The order of the Appellate Term and the judgment of the Municipal Court should be reversed on the law, and the complaint dismissed on the law, with costs to appellant in all courts.

LAZANSKY, P. J., HAGARTY, CARSWELL and ADEL, JJ., concur.

Order of the Appellate Term and the judgment of the Municipal Court reversed on the law and the complaint dismissed on the law, with costs to appellant in all courts.